139 P.3d 396 (2006)
134 Wash.App. 309
In re the DETENTION OF John Charles ANDERSON, Appellant.
No. 31915-2-II.
Court of Appeals of Washington, Division 2.
July 25, 2006.
*398 Judith Michele Mandel, Tacoma, WA, for Appellant.
Sarah Sappington, Office of the Atty. General, Seattle, WA, for Respondent.
VAN DEREN, J.
¶ 1 John Charles Anderson appeals the trial court's decision to civilly commit him as a sexually violent predator under chapter 71.09 RCW. He argues that the trial court erred when it (1) admitted statements he made during his treatment at Western State Hospital (WSH); (2) found he committed a recent overt act; and (3) refused to allow his chosen expert's testimony. Holding that the trial court erred in refusing to appoint a testifying expert for Anderson, we reverse and remand for a new trial.

FACTS

1. Criminal History
¶ 2 In 1988, at age 17, Anderson anally raped a two and a half-year-old boy. He admitted the rape to the police.
¶ 3 Anderson also told police that he was under supervision through the juvenile court for rape charges involving a neighbor girl.[1] Anderson's probation officer referred Anderson to Michael Comte for a psychosexual evaluation. During the evaluation, Anderson admitted raping the two and a half-year-old boy. He also admitted that when he was 13 years old he attempted to rape another two-year-old boy. This rape was never reported and the State never charged Anderson with it.[2]
¶ 4 In June 1988, Anderson pleaded guilty to first degree statutory rape and the court sentenced him to 100 weeks at the Maple Lane school, a juvenile rehabilitation center. The court extended the sentence after he wrote a threatening letter to a teacher at the juvenile court.
¶ 5 While at Maple Lane, Anderson and another boy assaulted Anderson's sleeping roommate. They put toothpaste on a radio antenna and put the antenna down the boy's pants. They did not insert the antenna into the boy's anus, and Anderson denied trying to do so. In September 1988, Anderson pleaded guilty to two counts of custodial assault and the court sentenced him to 21 to 28 weeks for each count.
¶ 6 In July 1989, Anderson exposed himself to an adult female Maple Lane staff member. He admitted to exposing himself to the same woman several times, but she only noticed once. In September 1989, he was convicted of public indecency and sentenced to 45 days in the Thurston County jail with an additional 45 days suspended for two years conditioned on no law violations and completing a psychosexual evaluation.
¶ 7 In April 1990, Anderson again saw psychologist Michael Comte for psychological and psychosexual testing. Anderson admitted to having fantasies about the woman he *399 exposed himself to. He said that he fantasized about putting her on a slab of plywood in four point restraints, shooting a staple gun around her, shooting staples through her breasts, inserting a large object in her anus, and then cutting off her breasts. Comte diagnosed Anderson with borderline personality disorder. He opined that Anderson lacked impulse control and posed a threat to the safety of others.
¶ 8 In 1990, after serving his sentence at Maple Lane and the Thurston County Jail, Anderson submitted to a psychological evaluation at WSH. CP 21. Subsequently, he voluntarily admitted himself to WSH, where he remained until the State commenced this action against him in February 2000.

2. Sexual History at WSH
¶ 9 During treatment at WSH, Anderson admitted fantasizing about cutting off women's breasts and hanging "them" in a shed.[3] Report of Proceedings (RP) at 157. At 13, he sexually molested his 11 year old male cousin. He also attempted to lure a five year old girl into a park to rape her. He exposed himself to her, but she told him to stop and ran away. Additionally, he fantasized about a different five year old girl in his neighborhood. In addition to these fantasies, Anderson also admitted that at the age of 15 he had sexual fantasies about and anally raped a two year old boy multiple times. Also at 15, Anderson anally raped a 13 year old boy who lived in his neighborhood.
¶ 10 While at WSH, Anderson engaged in sexual behavior with at least four male patients. In 1991, he had a sexual relationship with Daryl, a mildly to moderately retarded patient. In 1994 and 1995, Anderson had a relationship with Bobby, a mildly retarded patient. In 1996, Anderson had a sexual relationship with Curtis, a mildly retarded patient. All of these encounters involved fondling, fellatio, and either attempted anal intercourse, or anal intercourse. Anderson told his treating physician, Dr. Arnholt, about each of the relationships, and Dr. Arnholt counseled Anderson to end the contact because each of the men was disabled.
¶ 11 In addition, from 1993 to 1999, Anderson had an ongoing relationship with Rory. Rory was not retarded but had low-average intelligence, a borderline personality disorder, and had been seriously physically and sexually abused as a child. Dr. Arnholt counseled both men to end the relationship. They did not end it until shortly before Anderson left WSH. According to Dr. Arnholt, Rory had a "crush" on Anderson and he thought that sexual contact with Anderson would ensure a "special relationship." RP at 79. But when that relationship did not come to fruition, Rory began to act out, had difficulty controlling his anger, and showed functional deterioration for a time.
¶ 12 Anderson also had relationships with women while at WSH. One of the women had children, which violated a WSH rule prohibiting sex offenders from forming relationships with women with children. Anderson also had sex with a female who he knew was HIV positive.
¶ 13 Because Anderson was a voluntary patient at WSH, he was allowed to leave the grounds with permission. He did so and would leave to visit his mother. He also left without permission at least twice in his ten year stay.

3. Current Proceeding
¶ 14 In February 2000, the State filed a petition alleging that Anderson was a sexually violent predator (SVP) under RCW 71.09.020.[4] Anderson moved for a judgment on the pleadings, arguing that (1) the State, as a matter of law, failed to present sufficient facts to support the allegation that he was an SVP; and (2) his records at WSH were confidential under RCW 71.05.390 and were, therefore, inadmissible. The court denied *400 Anderson's motion, finding that the statute implicitly allowed the court to admit the records. Anderson filed an interlocutory appeal with this court. We denied review in May 2001. Anderson unsuccessfully asked us to reconsider the denial in light of State v. Wheat, 118 Wash.App. 435, 76 P.3d 280 (2003).
¶ 15 On April 12, 2004, one week before the trial was set to begin, Anderson requested that the court appoint Dr. Richard Wollert[5] as a testifying expert witness on Anderson's behalf. Anderson agreed, if necessary, to waive his trial date to accommodate Dr. Wollert. The State objected, arguing that Anderson already had an expert, Dr. Brian Judd, appointed at public expense but had chosen to not use him at trial.[6]
¶ 16 The court did not allow Dr. Wollert to testify, but it allowed him to consult with Anderson's counsel. The court's findings of fact and conclusions of law stated that Dr. Judd was made available to Anderson at public expense and that he was qualified in the area of sexually deviant persons. The court concluded that Anderson did not satisfy WAC 388-885-010(3)(c), which allows a person on trial for determination of SVP status to obtain a second expert at public expense upon a showing of good cause. Anderson thereafter repeatedly moved the court to allow Dr. Wollert to testify, arguing that the decision to discharge Dr. Judd had been made several years earlier by a different defense attorney and that he had since attempted to contact Dr. Judd, but had been unsuccessful. The court denied all such motions.
¶ 17 Dr. Amy Phenix testified as an expert for the State. Dr. Phenix is a forensic psychologist specializing in sex offenders and has conducted more than 200 SVP evaluations. She commonly relies on actuarial instruments to determine the likelihood a sex offender will reoffend. Actuarial instruments are tests based on statistical analyses of certain offender populations. The tests apply point levels to certain risk factors an offender may possess and those point levels produce an overall score, which represents an indication of the likelihood of reoffense.
¶ 18 Here, Dr. Phenix reviewed Anderson's entire file, which consisted of approximately 2,000 pages and included his treatment records and files from WSH, his juvenile adjudication and detention history, his prior offenses, and Dr. Comte's evaluations. In addition, Dr. Phenix met with Anderson in person for about four hours.
¶ 19 Dr. Phenix evaluated Anderson in the context of RCW 71.09.020(16), the statute that defines SVPs. First, she determined that he had been convicted of a crime of sexual violence (the 1989 statutory rape conviction). Second, she opined that he suffered from a mental abnormality or a personality disorder that caused him to have serious difficulty controlling his sexual behavior. She diagnosed Anderson with paraphilias, specifically sexual sadism, pedophilia, and a personality disorder not otherwise specified, with anti-social, borderline, and narcissistic traits. Dr. Phenix testified that sexual sadism is (1) the most deviant of all paraphilias; (2) the most unusual; (3) the most difficult to treat; and (4) predisposes Anderson to commit criminal sexual acts. She explained that paraphilias are chronic lifelong conditions that can be managed but not cured. Because Anderson had undergone years of treatment and had been unable to control his fantasies and urges, Dr. Phenix stated that he still suffered from sexual sadism and pedophilia. And thus, he was still a threat to reoffend.
¶ 20 Dr. Phenix used other evaluative tools to determine that Anderson would likely reoffend. She conducted a sex offender risk assessment using an actuarial instrument called the STATIC-99, which resulted in a score of 6 to 7,[7] indicating a high risk of reoffense. The STATIC-99, which is the *401 most commonly used actuarial instrument, looked at Anderson's (1) prior sexual offenses; (2) prior sentencing dates (terms of incarceration); (3) convictions for nonsexual offenses; (4) nonsexual violence committed at the time of his most recent sexual offense; (5) nonsexual violence in general; (6) victims (known victims versus stranger victims); and (7) relationship status (single versus in a committed relationship).
¶ 21 Because the STATIC-99 is limited in its ability to measure levels of sexual deviancy, Dr. Phenix also looked to Anderson's mental disorders to predict his likelihood of reoffense.
¶ 22 Finally, Dr. Phenix evaluated Anderson to determine whether he had committed a recent overt act. She opined that he had committed such an act through his relationships with patients at WSH who had low or very low IQs or were mentally retarded, and his persistence in this behavior throughout his stay at WSH. She compared these sexual relationships to his sexual assaults on children, stating that he used his authority and control over vulnerable adults to reenact his assaults on children. Further, Dr. Phenix pointed to Anderson's ongoing sexual fantasies involving children and sexual violence as recent overt acts. She also discussed various rule breaking behavior Anderson exhibited, including consuming alcohol, leaving WSH without permission, and inability to avoid high risk situations.
¶ 23 Anderson waived his right to a jury trial. The trial court found that Anderson satisfied the criteria for a SVP and entered findings of fact, conclusions of law, and an order of commitment. Anderson appeals.

I. ANALYSIS

1. Standard of Review
¶ 24 The decision to admit expert testimony is within the trial court's discretion. In re Detention of Twining, 77 Wash. App. 882, 891, 894 P.2d 1331 (1995). We will not reverse absent an abuse of that discretion, which occurs when the trial court acts on unreasonable or untenable grounds. Twining, 77 Wash.App. at 893, 894 P.2d 1331. The court should admit expert testimony if it will assist the trier of fact to understand the evidence or to determine a fact. Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d 654, 683, 15 P.3d 115 (2000).

2. Chapter 71.09 RCW
¶ 25 In 1990, Washington enacted legislation allowing the State to indefinitely confine offenders deemed likely to engage in "repeat acts of predatory sexual violence." RCW 71.09.010. The State bears the burden of proof and, in a civil trial, it must prove beyond a reasonable doubt that the offender met the SVP criteria. In re Detention of Henrickson, 140 Wash.2d 686, 692, 2 P.3d 473 (2000).
¶ 26 Because this law infringes on the fundamental right of freedom from restraint, it is only constitutional if it furthers a compelling State interest and is narrowly tailored. In re Detention of Albrecht, 147 Wash.2d 1, 7, 51 P.3d 73 (2002). "The constitution requires that a person shall not be deprived of life, liberty, or property without due process of law." CONST. amends. V, XIV; CONST. art. I, § 3; Albrecht, 147 Wash.2d at 7, 51 P.3d 73 (quoting In re Personal Restraint of Young, 122 Wash.2d 1, 26, 857 P.2d 989 (1993)). Thus, in order to further the legitimate State interest of protecting the public from a SVP, chapter 71.09 RCW requires that an individual be both mentally ill and dangerous before the State can civilly commit him. Albrecht, 147 Wash.2d at 7, 51 P.3d 73. Furthermore, our legislature requires that "[t]he dangerousness must be current." Albrecht, 147 Wash.2d at 7, 51 P.3d 73; chapter 71.09 RCW.
¶ 27 It is not contested that Anderson (1) has been convicted of a sexually violent crime; and (2) that he suffers from a mental abnormality or personality disorder. The issues at trial were whether Anderson (1) is likely to engage in a sexually violent act if not confined; and (2) whether he had committed a recent overt act.

3. Refusal to Allow Anderson's Expert Witness to Testify
¶ 28 Chapter 71.09 RCW is premised on finding those offenders subject to *402 commitment to be currently dangerous. Henrickson, 140 Wash.2d at 692, 2 P.3d 473. Current dangerousness is generally the subject of expert testimony. Experts widely rely on actuarial tools, like the STATIC-99 Dr. Phenix used here, to determine the likelihood of reoffense.
¶ 29 Anderson argues that the court erred when it refused to appoint Dr. Wollert because Dr. Wollert would have rebutted Dr. Phenix's use of the STATIC-99. Br. of Appellant 16. He would have testified that the actuarial tests Dr. Phenix administered did not accurately predict Anderson's future dangerousness because the sexually violent offenses Anderson committed occurred when Anderson was a juvenile. Br. of Appellant 16; CP 154.
¶ 30 The court denied Anderson's motion one week before trial in a case that had been initiated four years earlier. Anderson had one appointed expert, who he failed to use as his expert witness. Under these circumstances, it was not unreasonable for the court to require Anderson to make a showing of good cause for the appointment of a second expert under WAC 388-885-010(3)(c).
¶ 31 The State argues that the trial court properly refused Anderson's attempt to have Dr. Wollert appointed as an expert witness a week before trial because it was an overt delay tactic. In June 2002, Anderson had first indicated that he wanted to hire Dr. Wollert, but on June 24, 2002, he notified the State that he would not be calling any expert witnesses. The State argues that it based its decision to forgo a rebuttal expert because of Anderson's stated intention.
¶ 32 By April 2004, Anderson's case had been pending for almost four years and Anderson had been confined at the civil commitment center on McNeil Island since 2000. Additional delay would not appear to be in Anderson's best interest. And the record does not indicate that the appointment of Dr. Wollert would have resulted in undue delay. According to Anderson's motion, Dr. Wollert's testimony would have focused on the limited topic of recent scientific research questioning the efficacy of actuarial tests to predict future dangerousness of juvenile offenders.
¶ 33 Although Dr. Wollert was involved in another trial at the time of the motion, he offered to be available for the State's discovery at any time. Furthermore, the court delayed the second half of Dr. Phenix's testimony until May 12, 2004. Presumably, Dr. Wollert remained available during that entire month and his testimony would have followed the conclusion of the State's entire case.
¶ 34 The timing of Anderson's request for Dr. Wollert's appointment did not, therefore, result in delay or prejudice to the State's case. Change of trial counsel over the course of four years leading up to the trial, the availability of an expert with knowledge of actuarial instruments' applicability to adults convicted of sexually violent crimes as juveniles, notice two years earlier that Dr. Wollert was a possible expert witness, and the lack of actual trial delay all comprised good cause under WAC 388-885-010(3)(c).
¶ 35 Under these specific circumstances, we conclude that the trial court abused its discretion because its refusal to appoint Dr. Wollert denied Anderson the services of a trial expert to rebut the State's evidence of current dangerousness. Allowing Dr. Wollert to consult with Anderson and his counsel did not allow the trier of fact (the trial court itself in this case) to hear and consider Dr. Wollert's testimony challenging the validity of the use of the STATIC-99 to determine Anderson's current and future dangerousness.
¶ 36 We are reluctant to endorse last minute strategic changes that delay trials. See, e.g., Dempere v. Nelson, 76 Wash.App. 403, 406, 886 P.2d 219 (1994) (the trial court did not abuse its discretion in excluding an expert witness the appellant sought to introduce 13 days before a civil trial, which violated a discovery schedule). But the State did not require an urgent resolution because the court was not going to release Anderson before trial. And the State had had four years to prepare its case. It is true that Anderson's counsel did not offer especially persuasive arguments or reasons for the delay in notifying the State and the trial court of the requested expert or the change in trial strategy, but the record persuades us that *403 the trial court abused its discretion when it found that Anderson did not have good cause for the court to appoint Dr. Wollert under WAC 388-885-010(3)(c).
¶ 37 Since this is a civil action, no issue of double jeopardy arises on remand. Young, 122 Wash.2d at 25, 857 P.2d 989 (finding the SVP commitment statute a civil statute that does not serve a punitive goal, and thus, enforcing the statute does not violate double jeopardy). Thus, we remand for a new trial with the opportunity for Anderson to engage an appropriate expert witness.
¶ 38 We briefly address issues that may arise on remand.

II. ISSUES ON REMAND

1. Recent Overt Act.
¶ 39 Our Supreme Court has upheld the constitutionality of the SVP statute, Chapter 71.09 RCW, because the statute requires the State to demonstrate a substantial risk of harm evidenced by a recent overt act. Albrecht, 147 Wash.2d at 8, 51 P.3d 73. A recent overt act is "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." RCW 71.09.020(10).
¶ 40 But the State need not prove a recent overt act if the person is in total confinement at the time the state files its petition, because it would be impossible for the State to prove, and due process does not "`require that the absurd be done before a compelling state interest may be vindicated.'" In re Detention of McGary, 128 Wash. App. 467, 476, 116 P.3d 415 (2005) (quoting In re Personal Restraint of Turay, 150 Wash.2d 71, 83, 74 P.3d 1194 (2003)). Total confinement means "confinement inside the physical boundaries of a facility or institution operated . . . by the state or any other unit of government for twenty-four hours a day." McGary, 128 Wash.App. at 475, 116 P.3d 415 (quoting former RCW 9.94A.030(35) (1996)). Thus, only when the person has a genuine opportunity to reoffend, the State must demonstrate current dangerousness and prove a recent overt act. McGary, 128 Wash.App. at 476, 116 P.3d 415.
¶ 41 Here, for the ten years leading up to the State's petition, Anderson was confined at WSH, a state operated facility. Anderson's level of supervision during the 10 years of his stay varied from 24 hour lockdown to full grounds privileges. At times, with permission, the hospital allowed Anderson to leave to visit his mother. The State conceded on appeal that it had to prove that Anderson committed a recent overt act.
¶ 42 In In re Detention of Broten, we addressed whether an offender's actions constituted a recent overt act. 130 Wash.App. 326, 122 P.3d 942 (2005). We found that the State satisfied its burden of proving a recent overt act because (1) Broten had previously been convicted of a sexually violent crime; (2) after his release he engaged in a relationship with another sex offender, which violated the rules of his treatment; (3) he was arrested in a parking lot of a playground and he was prohibited from being in parks or around children without a chaperone; and (4) he admitted to repeatedly going to a park where children were present. Broten, 130 Wash.App. at 329-331, 122 P.3d 942. Additionally, Broten admitted to masturbating while thinking about possible new victims. Broten, 130 Wash.App. at 335, 122 P.3d 942. At trial, the State's expert testified that these actions constituted Broten's offense cycle and were part of his buildup in anticipation of reoffending. Broten, 130 Wash.App. at 335, 122 P.3d 942. We concluded that the act of going to the park (the offense buildup) taken together with his "mental history, numerous release violations, admission of fantasizing about molesting and raping young girls, and pattern of placing himself in high risk situations in anticipation of causing sexually violent harm, constituted a recent overt act." Broten, 130 Wash.App. at 336, 122 P.3d 942.
¶ 43 Here, the dissent suggests that we must dismiss this matter because the State failed to prove a recent overt act. But in her testimony, Dr. Phenix indicated that several of Anderson's actions qualified as *404 recent overt acts, which created a reasonable apprehension of sexually violent harm in the mind of an objective person who knew Anderson's history and mental condition. See RCW 71.09.020(10). For example, she pointed to Anderson's relationships with vulnerable patients, like Rory, at WSH. Although the evidence at trial did not indicate that Anderson had committed an actual rape, he engaged in serial sexual behaviors that exploited vulnerable adults, which acts were closely akin to his assaults on children. And his persistence in that conduct, his ongoing sexual fantasies involving sexual violence of children, his rule breaking behavior, and his inability to avoid high risk situations all indicated that he posed a clear risk to reoffend if released from custody. Moreover, since double jeopardy does not preclude retrial in the civil context, the proper remedy for insufficient evidence is remand, not dismissal. See, e.g., In re Detention of Turay, 139 Wash.2d 379, 415, 986 P.2d 790 (1999) (chapter 71.09 RCW does not violate double jeopardy because it is civil rather than criminal) (quoting Young, 122 Wash.2d at 59, 857 P.2d 989).

2. Anderson's Records
¶ 44 Anderson argues that the trial court improperly admitted his psychological records. He cites to RCW 71.05.390, which imposes a general rule of confidentiality for "all information and records compiled, obtained, or maintained in the course of providing services to either voluntary or involuntary recipients of services at public or private agencies." The State counters that the final unnumbered paragraph in RCW 71.05.390 properly allowed the court to admit such records.
¶ 45 The statute states in pertinent part:
The fact of admission, as well as all records, files, evidence, findings, or orders made, prepared, collected, or maintained pursuant to this chapter shall not be admissible as evidence in any legal proceeding outside this chapter without the written consent of the person who was the subject of the proceeding except in a subsequent criminal prosecution of a person committed pursuant to RCW 71.05.280(3) or 71.05.320(2)(c) on charges that were dismissed pursuant to chapter 10.77 RCW due to incompetency to stand trial or in a civil commitment proceeding pursuant to chapter 71.09 RCW.

RCW 71.05.390(16) (emphasis added).
¶ 46 At oral argument, Anderson cited to RCW 71.05.630(1), which states: "Except as otherwise provided by law, all treatment records shall remain confidential." He argues that RCW 71.05.630 sets out instances in which records may be released, and SVP proceedings are not identified. Therefore, he argues that the legislature did not reconcile RCW 71.05.390 with RCW 71.05.630, and since rules of statutory construction require us to give meaning to all words in a statute, we must abide by RCW 71.05.630 and maintain the confidentiality of Anderson's records. See, e.g., State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003) (citations omitted) (the court must apply a statute as it is written). Anderson's argument fails.
¶ 47 RCW 71.05.390 specifically removes the restriction on all records when the issue is whether a person will be confined in a civil setting for treatment as a SVP. As such, it is an exception "otherwise provided by law" under RCW 71.05.630. Any apparent conflict between the statutes is resolved by the well established rule of statutory construction that favors specific statutory language over general provisions. See ETCO, Inc. v. Dep't of Labor & Indus., 66 Wash.App. 302, 305-06, 831 P.2d 1133 (1992). Thus, the more specific language of RCW 71.05.390 governs and allows the court to review Anderson's mental health records.
¶ 48 Anderson also cites to Wheat, arguing that it prevents the trial court from admitting treatment records. 118 Wash.App. 435, 76 P.3d 280. Wheat, however, is inapposite. In Wheat, we held that the trial court erred when it admitted Wheat's drug and alcohol treatment records under RCW 70.96A.150. 118 Wash.App. at 438, 76 P.3d 280. But RCW 70.96A.150 is not a specified exception to the restrictions on admission of records under RCW 71.05.390. And the case dealt with whether federal regulations about drug and alcohol treatment records applied to state law. This is not at issue here, and the case is not dispositive.
*405 ¶ 49 In light of the clear statutory language allowing the court to admit records in civil commitment proceedings under chapter 71.09 RCW, the trial court did not err and properly admitted Anderson's treatment records.
¶ 50 We reverse and remand for a new trial consistent with this opinion.
I concur: QUINN-BRINTNALL, C.J.
ARMSTRONG, J. (Dissenting).
¶ 51 Because insufficient evidence supports a finding that Anderson committed a recent overt act, I dissent.
¶ 52 A recent overt act is "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." RCW 71.09.020(10). At trial, the State offered evidence that Anderson (1) broke Western State Hospital rules that prohibited alcohol consumption and required hospital permission to leave the facility; (2) fantasized about sexual acts and violence toward children and women; and (3) engaged in consensual homosexual relationships with other adult patients, three of whom were mentally retarded and one of whom had "low-average" intelligence. RP at 79.
¶ 53 The first two forms of evidence, rule-breaking and sexual fantasy, do not prove a recent sexually violent act. A recent overt act must be of a "sexually violent nature," and the State does not contend that Anderson's consuming of alcohol or leaving the hospital without permission were of a sexually violent nature. RCW 71.09.020(10); RP at 252-53. Also, a recent overt act must constitute an "act or threat." RCW 71.09.020(10). A sexual fantasy is a thought, not an act. And, standing alone, a sexual fantasy does not comprise a threat of harm to another. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 2382 (2002) (defining "threat" as an "expression of an intention to inflict loss or harm on another" or "something that by its very nature or relation to another threatens the welfare of the latter").
¶ 54 Further, Anderson's consensual relationships with other adults do not amount to sexually violent acts because the relationships did not causeor create a reasonable apprehension ofharm of a sexually violent nature. See RCW 71.09.020(10). By way of comparison, our Supreme Court found sufficient evidence of a recent overt act because the offender, Marshall, committed third degree rape. In re Detention of Marshall, 156 Wash.2d 150, 159, 125 P.3d 111 (2005). Marshall had previously molested several children between nine and eleven years old and he recently raped a developmentally disabled woman who functioned at the level of a ten to twelve-year-old child. Marshall, 156 Wash.2d at 153-54, 125 P.3d 111. In another case, we found that a sex offender committed a recent overt act because he was convicted with communicating with a minor for immoral purposes. State v. McNutt, 124 Wash. App. 344, 351-52, 101 P.3d 422 (2004). The offender previously beguiled children into performing sadistic acts on him and had recently been incarcerated for inviting a fourteen-year-old girl and three young adult males to his house and asking them to make him into their "sex slave." McNutt, 124 Wash.App. at 351, 101 P.3d 422.
¶ 55 A finding of a recent overt act is also appropriate where an offender engages in sexual grooming or planning of sexual offenses. See In re Detention of Broten, 130 Wash.App. 326, 335-36, 122 P.3d 942 (2005). We found sufficient evidence of a recent overt act where the offender, Broten, was a child molester who repeatedly lingered in his car at a playground, shopping malls, and parks to watch children. Broten, 130 Wash. App. at 331, 122 P.3d 942. Broten admitted that he masturbated in his car and masturbated while thinking about possible new victims; and Broten repeatedly pursued situations where he could get close to children. Broten, 130 Wash.App. at 335-36, 122 P.3d 942. Similarly, we found sufficient evidence of a recent overt act where a sex offender with a history of offering children money to groom them for sexual molestation, gave a young boy 50 cents to follow him, then grabbed the boy's arm when the boy hesitated. *406 In re Detention of Albrecht, 129 Wash. App. 243, 257, 118 P.3d 909 (2005).
¶ 56 In short, in every case where we found sufficient evidence of a recent overt act, the act was a continuation of the sex offender's pathological behavior. In each case, the offender either (1) harmed another person sexually by committing a sex offense, as in Marshall and McNutt, or (2) threatened sexual harm by expressing and taking some act to further his intent to victimize another person, as in Broten and Albrecht. Marshall, 156 Wash.2d at 159, 125 P.3d 111; McNutt, 124 Wash.App. at 351, 101 P.3d 422; Broten, 130 Wash.App. at 330-31, 122 P.3d 942; Albrecht, 129 Wash.App. at 257, 118 P.3d 909.
¶ 57 But the State reasons that Anderson's consensual sexual relationships with other hospital patients created a reasonable apprehension of harm of a sexually violent nature. See RCW 71.09.020(10). I disagree. Anderson did nothing more than engage in consensual sexual relationships with other male patients. Although some of Anderson's partners were either mild to moderately mentally retarded, during the four years before trial Anderson had only one partner and that partner was not developmentally disabled. And, unlike every case described above, Anderson's recent acts bore no relation to his sexual pathology. Moreover, neither the State's expert witness nor Anderson's physicians testified that Anderson exhibited or threatened sexually violent behavior towards any of his sexual partners. If a consensual sexual relationship coupled with a sexually violent history is sufficient to prove a recent overt act, then no sex offender could have a sexual relationship without fear of involuntary commitment. The legislature could not have intended "recent overt act" to be so broadly defined.
¶ 58 Still, the majority reasons that "since double jeopardy does not preclude retrial in the civil context, the proper remedy for insufficient evidence is remand, not dismissal." Maj. at 404. I agree that double jeopardy does not apply to civil commitment proceedings. But if we hold that the State failed to prove a recent overt act, res judicata or law of the case would prevent the State from again litigating the issue on the same evidence. Because the State failed to prove a recent sexually violent act, I would reverse and dismiss.
NOTES
[1] The record does not further explain these charges.
[2] Anderson later admitted to repeatedly raping this young boy.
[3] The record is unclear as to whether Anderson fantasized about hanging women or their breasts in sheds.
[4] RCW 71.09.020(16) defines a sexually violent predator as:

[A]ny person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.
[5] In June 2002, Anderson informed the State that he wished to consult with Dr. Wollert, but that he had not made any arrangements with the doctor yet.
[6] The State attempted to depose Dr. Judd several times in 2001. Once Anderson indicated that he did not intend to use Dr. Judd, the State ceased trying to schedule the deposition.
[7] Dr. Phenix was unsure of Anderson's actual convictions, therefore she determined his score was either a 6 or a 7.