# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IN RE DETENTION OF | ) | No. 71116-4-I |
| | ) | |
| GARTH SNIVELY, | ) | |
| | ) | DIVISION ONE |
| Appellant | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | FILED: April 20, 2015 |

SPEARMAN, C.J. — Garth Snively was civilly committed as a sexually violent predator (SVP) in 2006. He petitioned for unconditional release in October 2012. At trial, the jury found that he continued to meet the requirements for commitment as an SVP. Snively appeals, claiming that there was insufficient evidence to support the verdict. He also argues that the trial court erred when it admitted evidence that, if released, he would not have a fixed residence. We find no error and affirm.

## FACTS

In 1994, Garth Snively was convicted of two counts of first degree child molestation and indecent liberties and sentenced to a prison term.[1] Before completing that sentence, the State petitioned to have Snively civilly committed as a sexually

---

[1] As part of his sentence, Snively was required to serve a two-year term of community placement. He served over a year and a half of that time at a secure community facility, beginning in March 2012. At the time of trial, October 2013, he had approximately five months remaining.

violent predator (SVP) under chapter 71.09 RCW. In 2006, a jury determined that Snively met the statutory definition of an SVP and he was committed to the Special Commitment Center (SCC). On March 3, 2012, Snively was conditionally released to the Secure Community Transition Facility (SCTF) on McNeil Island. Dr. Marquez, the forensic manager at the SCC, evaluated Snively in 2012 and determined that he no longer met the definition of a sexually violent predator. In October 2012, Snively petitioned for unconditional release based on Dr. Marquez's review and trial was set for October 2013.

At trial, the only issue in dispute was whether Snively's undisputed mental abnormalities made him likely to engage in predatory acts of sexual violence if not confined to a secure facility. In support of its position that Snively was likely to do so, the State offered the expert testimony of Dr. Amy Phenix.[2] Dr. Phenix testified that she found "fairly overwhelming evidence about the difficulty [Snively] had attempting to stop from acting on his paraphilic disorders while he was in the community." Verbatim Report of Proceedings (VRP) (10/18/13) at 25. She concluded that Snively's conditions "very strongly predispose[d] him to continue to commit these types of offenses in the future," and that he was "likely to engage in predatory acts of sexual violence if he is not confined in a secure facility." Id. at 32.

Dr. Phenix further testified that she performed the Static-99R Risk actuarial assessment (S-99R) on Snively, and that it had the best predictive accuracy with regard

---

[2] Snively moved to exclude any testimony by Dr. Phenix about the hearsay opinions of non-testifying experts, the effect of unreported offenses on actuarial data, and opinions based on her clinical judgment. The trial court granted the motion in part. It excluded testimony about the effect of Snively's unreported offenses on the actuarial assessments, but allowed Dr. Phenix to testify regarding the general limitations of those assessments. Snively's motion was otherwise denied and he does not appeal this ruling.

to offender recidivism. While Snively scored low on the S-99R, she testified that his score did not accurately capture his risk. She explained how Snively "has been highly sexually preoccupied throughout his life," as evidenced "by his offending, by his admissions and statements about his sexual drive." Id. at 39. According to Dr. Phenix, Snively was still "concerned about continuing to have deviant sexual fantasies" and how he will handle them. Id. The test compared Snively to 8,000 other sex offenders, but in her opinion, "very few of those offenders" were likely to have the "strong sexual deviancy" that Snively had, with his high level of sexual preoccupation and three paraphilias. Id.

Dr. Phenix also testified that Snively was struggling with finding an appropriate sexual outlet. He told her that he wanted to be sexual when out in the community and that it would be a daily struggle, because he had no appropriate alternatives to express his sexuality. On cross-examination, Dr. Phenix admitted it was possible that reasonable evaluators could have reviewed Snively's actuarial scores, his age, and the fact that he has participated in sexual deviancy treatment, and could have found it more likely that Snively would not reoffend, but that she would disagree with such a finding.

The State also presented testimony from Dr. Joe Mitrovich, who treated Snively at the SCC in 2009 and 2012. Dr. Mitrovich worked with Snively on relapse prevention and developing an individual treatment plan. He testified that Snively's plans, however, "lacked the cognitive aspects of the interventions" that he expected to see from someone in the advanced stages of treatment. VRP (10/17/13) at 54. He also testified that Snively was very lacking in transparency, i.e., he denied masturbating to any fantasies and described the process as "mechanical," which Dr. Mitrovich found very

3

unusual. Id. at 55. In 2012, Snively mentioned having vague fantasies but declined to delve into the issues related to his offending. Dr. Mitrovich also mentioned that there was once a young resident at the facility who had a fetish similar to Snively's. While Snively acknowledged that it was a high-risk situation for him and potentially very dangerous and arousing, he declined to process the situation beyond a mere mention. At that time the expectation would have been for Snively to be able to explain how the resident's presence tied into his offense cycle, but more importantly, how he planned to intervene, manage the situation, and stay safe. When Snively left treatment with Dr. Mitrovich, he continued to talk about his issues in a historical context but had not addressed them in the present, nor had he articulated or developed any well-thought out interventions for managing his sexual interests.

Snively presented four doctors who testified in favor of his release: Dr. Marquez, the forensic manager at the SCC who determined that Snively was no longer dangerous; Dr. Duthie, a member of the senior clinical team who reviewed Dr. Marquez's evaluation and agreed with his findings; Dr. Packard, who worked with the State on civil commitment cases; and Dr. Hawkins, a psychologist who had treated Snively at the SCTF.

Dr. Marquez, the interim forensic manager at SCC, evaluated Snively in 2011 and 2012. In 2011 he concluded that Snively met the criteria for an SVP but was ready for a less restrictive setting and he recommended Snively for the SCTF. As part of the 2012 evaluation, Dr. Marquez administered the S-99R to Snively and he received a low score of zero. Based on that score, there was a seven percent chance that Snively would reoffend during a subsequent five year period, or a twelve percent chance within

ten years. He also testified that Snively "seemed to be in tune with some significant risks," and seemed to know that his particular interests and fetishes would "probably haunt him for the rest of his life." VRP (10/21/13) at 93. When asked to provide his ultimate opinion as to whether Snively was more than 51 percent likely to reoffend, Dr. Marquez testified that he believed the likelihood was "lower than that." Id. at 99. On cross-examination, Dr. Marquez admitted that while Snively had been practicing his interventions in a controlled environment, it would be a "huge" difference if he were to be released in the community, and that there would still be the risk that Snively would find a dysfunctional family or a vulnerable child. According to him, that risk "needs to be considered" and Snively "needs to [be] diligent in overcoming that." Id. at 118.

Dr. Packard evaluated Snively in 2005-06 and in 2011. Dr. Packard met with Snively a number of times and administered multiple psychological tests. He testified about the limitations of actuarials, dynamic risk factors, and other clinical tools. Based on the results of the various tests, he concluded that Snively's recidivism risk was generally less than 10 percent, and that he would be considered in the "low to even possibly very- low risk categories." VRP (10/22/13) at 77. Dr. Packard testified that Snively's multiple paraphilias would not make him more of a risk than the actuarials would suggest. He did agree on cross examination, however, that people who have pedophilia "have a sense of urgency inside of them, a drive, an interest, a direction towards engaging in sexual behavior with prepubescent children," and that they have a tendency toward behaving in that way that is "hazardous and dangerous and harms people." VRP (10/23/13) at 27-28.

5

Dr. Duthie, a member of the SCC's senior clinical team, testified that the team "look[ed] at Dr. Marquez's 2012 evaluation stating that Mr. Snively no longer met criteria under the law" and "agreed with the evaluator essentially." VRP (10/23/13) at 64. Dr. Duthie testified about Snively's placement in Barriers to Discharge and identified three of his barriers: image management, transparency, and reorienting sexual desires. He testified that he saw Snively as wanting to "present himself as a likeable, caring person," but that the senior clinical team was concerned because they had seen "some of the same behaviors that he used to groom victims." Id. at 66. The team was "very, very sensitive about those behaviors in group, very confrontive of him when we saw anything like that happening in group." Id.

Dr. Hawkins testified that he thought that Snively was "ready to deal with his deviancy in a community setting" "[b]ecause he's done the work." VRP (10/23/13) at 114. In his opinion, Snively had "done the different kinds of assignments that we would expect him to do. He's incorporated the principles of healthy sexuality in his life. He understands his sexually deviancy history. He's got safe guards against re-offending. He's ready." Id. at 115. Dr. Hawkins also testified that Snively had "developed appropriate interventions if he finds himself in a high risk situation." Id. He admitted, however, that he had only been treating SVPs since April 2012, a year and a half before trial, and that Snively was only the second SVP that he had ever treated.

On cross-examination, the State presented Dr. Hawkins with his own treatment reports, many of which consisted of single pages. These reports contained conclusions that Snively had "done extremely well in his treatment," and had discovered a senior gay support group that "may be an appropriate outlet for him and his need for support."

VRP (10/23/13) at 125. Dr. Hawkins acknowledged that "someone from senior clinical [said] to [him] that these one page reports were insufficient" and that he was "asked to provide more detail[.]" Id. at 128. As a result, Dr. Hawkins testified that he began to submit three-page monthly reports. But he conceded that many of those reports contained identical content that was simply repeated each succeeding month. Every report concluded that Snively was not sexually preoccupied, that he understood that he could no longer molest children, and that he no longer identified with them. Dr. Hawkins also acknowledged in his testimony that he had reviewed Snively's updated sexual autobiography, and that it was "riddled with massive thinking errors." Id. at 143.

The trial court overruled Snively's objection to the introduction of evidence that he did not have any definite plans for housing if he were to be released. Accordingly, portions of Snively's videotaped deposition were played at trial, where he testified about planning to rent a house in Shelton, and perhaps in the future, buy a piece of property in Centralia, where his mother lives. The court also admitted testimony about the difficulties that sex offenders encounter when trying to find housing; that Snively had discussed various housing locations in Shelton, Centralia, Tacoma and Everett; and about whether Snively had the resources to find housing and take care of himself if released. The jury returned a verdict finding that the State had proved beyond a reasonable doubt that Snively was an SVP as defined in RCW 71.09. The trial court entered an order of commitment on October 24, 2013. Snively appeals.

## DISCUSSION

Snively argues that there was insufficient evidence to support the finding that he was likely to engage in predatory acts of sexual violence if not confined in a secure

7

facility, as required for confinement under RCW 71.09.020(18). We disagree. Evidence is sufficient to support an order of civil commitment if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Myles, 127 Wn.2d 807, 816, 903 P.2d 979 (1995); RCW 71.09.060(1). All reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the respondent. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Appellate courts defer to the trier of fact regarding a witness's credibility, conflicting testimony, and the persuasiveness of the evidence. In re Detention of Broten, 130 Wn. App. 326, 335, 122 P.3d 942 (2005) (citing State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).

Chapter 71.09 RCW governs the civil commitment of SVPs in Washington State. Under RCW 71.09.020(18), a "sexually violent predator" means "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." A person is "likely to engage in predatory acts of sexual violence if not confined in a secure facility" if he or she "more probably than not will engage in such acts if released unconditionally from detention on the sexually violent predator petition." RCW 71.09.020(7).

The first two elements are not in dispute. In 1994, Snively pled guilty to and was convicted of two counts of first degree child molestation and indecent liberties. At trial, all experts agreed that Snively continued to suffer from at least two qualifying mental abnormalities: pedophilia and fetishism. The contested issue was whether or not these abnormalities made Snively more than 50 percent likely to reoffend as described by the

statute if he is released. This third element must be supported by proof of "'serious difficulty ... controlling behavior.'" In re Det. of Audett, 158 Wn.2d 712, 728, 147 P.3d 982 (2006) (quoting In re Det. of Thorell, 149 Wn.2d 724, 758-59, 72 P.3d 708 (2003)).

According to Snively, no reasonable trier of fact could have concluded that he was more than 50 percent likely to reoffend, because four doctors testified that he was no longer sufficiently dangerous to merit confinement. He also argues that even the State's expert, Dr. Phenix, testified that he scored very low on the risk assessment actuarial materials.[3] The State argues that the jury's finding was amply supported by testimony from Dr. Phenix and other witnesses, even in spite of Snively's low test scores.

We agree with the State. It is the jury's task to assess the credibility of the various witnesses and to weigh the conflicting testimony and the persuasiveness of the evidence. Their determinations on those issues are not subject to review on appeal. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Here, Dr. Phenix testified that Snively's likelihood of reoffending was greater than 50 percent, and explained why the test results did not accurately predict the risk of recidivism for someone like Snively. Both parties presented evidence of Snively's serious difficulty controlling his behavior,

---

[3] Snively submitted a statement of additional authorities in support of his claim that Dr. Phenix's testimony is insufficient to support the jury's verdict. In In re Det. of Anderson, 134 Wn. App. 309, 316, 139 P.3d 396 (2009), Snively notes that Dr. Phenix testified that "she commonly relies on actuarial assessments to determine the likelihood a sex offender will reoffend." To the extent this previous testimony arguably impeaches Dr. Phenix's trial testimony, it goes to the jury's assessment of the weight to be given to the doctor's opinion, a matter we do not review on appeal. In In re Coffel, 117 S.W. 3d 116, 129 (Mo. Ct. App. 2003), the court found Dr. Phenix's testimony insufficient to support the trial court's finding that a female defendant was an SVP because there were no scientific theories generally accepted in the psychological community regarding what risk factors lead female sexual offenders to reoffend sexually. For that reason, the court noted that Dr. Phenix's opinion that the female defendant "would reoffend sexually would not be admissible over a proper objection." Id. at 129. Because Snively is a male, Coffel is of no help to him.

his lack of willingness to develop and engage interventions, and his lack of transparency. Viewed in the light most favorable to the State, there is ample evidence based upon which a reasonable fact finder could conclude beyond a reasonable doubt that Snively was an SVP.

Snively next argues that the trial court erred when it admitted evidence of the lack of certainty surrounding his options for post-release housing. He first contends admission of the evidence violated his right to due process because it relieved the State of the burden of proving that his mental abnormality caused him to be more likely to reoffend if released. According to Snively, evidence of his lack of housing permitted the State to argue, and the jury to conclude, that, it was his possible homelessness, rather than his mental abnormality, that caused him to be more likely to reoffend. He also contends the evidence was inadmissible pursuant to ER 403 because it is more prejudicial than probative. According to Snively, this is because the evidence "evoke[s] the negative stereotype of a homeless sex offender in the minds of the juror." Brief of Appellant at 12. Lastly, Snively argues that RCW 71.09.060(1) contemplates the admission of evidence of his post-release housing plans only if he first offers some evidence on the subject. He contends it is error to admit such evidence when offered by the State unless it is to rebut evidence offered by him.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. In re Det. of West, 171 Wn.2d 383, 396-97, 256 P.3d 302 (2011). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. Id. A trial court's decision is manifestly unreasonable if it "adopts a view that 'no reasonable person would take." In re Pers. Restraint of Duncan,

167 Wn.2d 398, 402-03, 219 P.3d 666 (2009) (quoting Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006)). Claims alleging violations of constitutional rights are reviewed de novo. In re Det. of Fair, 167 Wn. 2d 357, 362, 219 P.3d 89 (2009).

We first consider whether evidence of Snively's lack of housing if released is admissible in an SVP proceeding if offered by the State in its case in chief instead of as rebuttal evidence. We conclude that it is. In Duncan, the trial testimony established that if released, Duncan planned to live with Dion Walls. Duncan, 167 Wn.2d at 401. On cross examination of Duncan's expert, the State asked, over objection, if he was aware that the person Duncan planned to live with, if released, was a convicted sex offender, to which the expert answered in the affirmative. The jury found Duncan was an SVP and he appealed arguing that the court erred in admitting evidence of with whom Duncan intended to reside. The court rejected Duncan's argument, holding that "[e]vidence of who a defendant intends to live with upon release into the community is relevant information in an SVP commitment proceeding. The fact that Duncan intended to live with a former sex offender was properly presented to the jury." Duncan, 167 Wn. 2d at 405. Thus, under Duncan, evidence of post-release living arrangements is clearly relevant. The trial court did not err in admitting this evidence.[4]

Snively argues that even if relevant, the evidence is inadmissible under ER 403 because any probative value of evidence of Snively's homelessness was greatly outweighed by its prejudicial effect. He argues that "[a]dmitting this evidence allowed

---

[4] Snively also cites Duncan to argue that testimony regarding his post-release living arrangements is inadmissible unless evidence on that issue is offered by him in the first instance or in rebuttal. Duncan does not support his position. The case does not establish who first offered evidence of Duncan's living situation and, contrary to Snively's contention, there was no limitation on the court's holding that the evidence was relevant.

the State to conjure the stereotype of a homeless sex offender to appeal to the passions and prejudices of the jury." Br. of Appellant at 24. But it was within the trial court's discretion to weigh the prejudicial effect of Snively's uncertain plans against the probative value of the testimony and Snively does not show that the trial court abused its discretion in so doing. Moreover, even if the evidence was admitted in error, the error was harmless. An evidentiary issue is not harmless if "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" In re Det. of Post, 170 Wn.2d 302, 314, 241 P.3d 1234 (2010) (Post 2) (quoting State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2000)). Snively makes no showing that the evidence of his living arrangements, if released, materially affected the outcome of the trial. His only argument relies on his contention that there was insufficient evidence for the jury to find him dangerous. Therefore, Snively argues, the jury's finding must be based on evidence of his possible homelessness if released. But because we have already concluded that there is sufficient evidence in the record to support the jury's verdict, Snively fails to show that he was unduly prejudiced in any way by the admission of this evidence.

Next, Snively argues that the admission of evidence of his possible homelessness, if released, violated his due process rights under the Fourteenth Amendment of the United States Constitution because "it relieved the fact finder from determining whether a causal connection existed between his mental abnormality and the dangerousness required for commitment." Reply Br. at 1-2. Civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. In re Harris, 98 Wn.2d 276, 279, 654 P.2d 109 (1982). Substantive due

process is satisfied if a finding of dangerousness is linked to the existence of a mental abnormality or personality disorder that makes it seriously difficult for the person with the abnormality or disorder to control his or her behavior. In re Det. of Post, 145 Wn. App. 728, 755, 187 P.3d 803 (2008) (Post 1). On appeal, the reviewing court is required to determine whether sufficient evidence exists to establish such a link. Thorell, 149 Wn.2d at 736.

We have already concluded that there is sufficient evidence in the record to support the jury's verdict. In addition to evidence of Snively's conceded mental abnormalities, there was substantial evidence that the conditions caused him to have serious difficulty controlling his behavior. Moreover, Snively points to nothing in the record suggesting that the jury determined he was dangerous because of the uncertainty about where he would reside if released. The jurors asked no questions about Snively's plan post-release, except for what Dr. Marquez's treatment recommendations would be and whether his opinion of Snively's likelihood of reoffending would change if he were located in a rural or an urban area. We hold that the admission of the disputed evidence did not violate Snively's constitutional rights.

Finally, Snively argues that RCW 71.09.060 dictates what evidence a fact finder may consider when determining whether or not a person is likely to reoffend. The statute reads: "[i]n determining whether or not the person would be likely to engage in predatory acts of sexual violence if not confined in a secure facility, the fact finder may consider only placement conditions and voluntary treatment options that would exist for the person if unconditionally released from detention on the sexually violent predator petition." RCW 71.09.060(1). According to Snively, the statute allows a jury to consider

13

only evidence of "voluntary treatment options," in other words, affirmative actions or plans, not the absence of such plans. He argues that the statute, along with subsequent case law and the comment to the Washington Pattern Jury Instructions, all preclude the State from bringing up his lack of housing options to show dangerousness. Brief of Appellant at 17.

The statute does not define "placement conditions" or "voluntary treatment options." In Post 2, the respondent's voluntary post-release treatment plans "consisted of regular individual treatment and marital counseling," along with group therapy and "continuing to participate in a nonviolent communications group he had joined while in prison." 170 Wn.2d at 313. In another instance, a jury considered a respondent's intent to enroll in a sexual deviancy plan upon release when determining whether he met the requirements for commitment. Detention of Paschke v. State, 121 Wn. App. 614, 618, 90 P.3d 74 (2004). The comment to the 6A WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 365.14 (WPIC) (6TH ED. 2012) also suggests what settings or activities will be considered "placement conditions" or "voluntary treatment options." The pertinent instruction reads "[i]n considering [placement conditions or] voluntary treatment options, however, you may consider only [placement conditions or] voluntary treatment options that would exist if the respondent is unconditionally released from detention in this proceeding." The comment indicates that the instruction "allows consideration of respondent's voluntary measures to reduce his or her risk to the community and consideration of court-ordered conditions that would exist if the SVP petition were dismissed." Id. "In general, voluntary measures include things such as respondent's promise to engage in community treatment regardless of commitment status," and

"'[c]onditions that would exist,'" are "typically pre-existing community supervision conditions placed on respondent in connection with a prior criminal conviction." Id.

We find Snively's attempt to classify homelessness as a proposed placement condition or a voluntary treatment option, or a deficiency in either, unconvincing. Snively's lack of established housing plans do not approximate any of the listed examples of "placement conditions" or "voluntary treatment options" as contemplated by the statute. We therefore reject his argument that the statute requires exclusion of the evidence of his housing status.

Affirmed.

WE CONCUR: